**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

TERRILL LASHON LAMBETH,

      Petitioner,

                                 CASE NO. 2:10-CV-14353
v.                            HONORABLE GEORGE CARAM STEEH
                                 UNITED STATES DISTRICT JUDGE

STEVEN RIVARD,

      Respondent.

_____/

## OPINION AND ORDER DENYING THE PETITION FOR WRIT OF HABEAS CORPUS AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY

      Terrill Lashon Lambeth, ("Petitioner"), confined at the St. Louis Correctional Facility in St. Louis, Michigan, seeks the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  In his application, filed by attorney Kristoffer W. Tieber, petitioner challenges his conviction for first-degree premeditated murder, M.C.L.A. 750.316; and possession of a firearm in the commission of a felony, M.C.L.A. 750.227b.  For the reasons stated below, the petition for writ of habeas corpus is **DENIED.**

### I. Background

      Petitioner was convicted of the above charges, following a jury trial in the Kent Count Circuit Court, in which he was tried jointly with his co-defendant and brother Sammie Rae Bailey, Jr., but with separate juries.  Petitioner's conviction arose from the shooting death of Keith Hoffman in Grand Rapids, Michigan.

1

On May 3, 2006, Grand Rapids Police Officer Thomas Gootjes and Officer Phil Braate were dispatched to an area near the intersection of Dallas Avenue and Prince Street in Grand Rapids, Michigan following a report of a shooting. Both officers testified that they responded to the crime scene in less than a minute after receiving the dispatch. (Tr. 3/20/07, pp. 16-17; 21-22, 30, 42-43). Officer Gootjes saw the victim lying on the ground on his side. Officer Gootjes checked the victim and found neither a pulse nor breathing but observed a number of gunshot wounds to the body. (*Id.,* pp. 21-22, 25). Officer Gootjes noticed a small bag with a single rock of crack cocaine by the victim's mouth and a small bag of marijuana by his left hand. (*Id.,* pp. 28-29). Officer Gootjes testified that did not see a gun around or on the victim's body. (*Id.,* pp. 38-40). Officer Gootjes and Officer Braate testified that a small group of people, less than ten, were standing near the victim when the police arrived. These individuals backed away from the victim's body immediately when asked by Officer Gootjes to do so. Although a large group of persons began to congregate across the street, none moved close enough to the crime scene to concern Officer Gootjes. Both officers testified that they did not see anyone kneeling near or directly by the victim's body when they arrived. Officer Gootjes remained with the victim's body to assure that no one came near him. Although the persons across the street became verbally hostile, no one other than fire department personnel, ambulance personnel, or police were allowed in the immediate vicinity of the victim's body.

2

(*Id.,* pp. 21-25, 31, 44-46).

Several eyewitnesses to the shooting testified that petitioner and the co-defendant came up to the victim and began shooting at him from 20-25 feet away even as the victim attempted to turn away. (*Id.,* pp. 106, 157, 219, 222-23, 246). These witnesses testified that they did not see the victim in the possession of a firearm at the time of the shooting. (*Id.,* pp. 76, 163, 183-84, 224).  Although two witnesses indicated that a man named Amonte McDonald had talked about taking some crack cocaine off of the victim after he had been shot, they indicated that McDonald did not actually do so. (*Id.,* pp. 109-10, 127).  The eyewitnesses testified that petitioner and his co-defendant were wearing white t-shirts. (*Id.,* pp. 110, 151; Tr. 3/21/07, pp. 24-25, 35).  One eyewitness, Charles Long, testified that it took more than twenty minutes for the police to respond to the call, (*Id.,* p. 126), although another witness, Marion Kilgore, testified that she could not recall how soon the police responded to the scene, but indicated that "it seemed fast and it seemed long.  But, it seemed fast.  I'm not sure.  I'm not sure." (*Id.,* p. 75).

Charles Long testified that the taller of the two men walked up to the victim after he had already fallen to the ground, stood over him, and fired another shot. (Tr. 3/20/07, p. 106).  Long stated that he stood by the victim when police arrived and testified that no one took any items from the victim's body. (*Id.,* pp. 107, 109).

Fred Reed testified that two men came running and yelling down the street, before shooting the victim in the back.  Both men had guns.  Neither man had

3

exchanged any words with the victim prior to shooting him.  Reed testified that the men shot at the victim from about 25 feet away and after the victim fell to the ground, one of the men "run up closer and emptied the gun in him."  Reed indicated that the victim fell after the first shot and "was layin' on his side, and they shot him in the back."  After shooting the victim, the men fled the scene. (*Id.,* pp. 155-58, 161, 174).

Kevin Strickland saw two men approach the victim and stated that the victim turned away like he was going to run, before being shot.  Strickland did not see the victim with a gun.  Strickland stated that one of the two men came over and stood over the victim and shot him again. (*Id.,* pp. 218-19, 222-24, 246).

Dr. David Start, a forensic pathologist, performed the autopsy on the victim and located seven gunshot wounds on his body. (Tr. 3/23/07, pp. 37-38).  Two of the gunshot wounds (A & B) were to the victim's forearm or wrist regions.  Dr. Start indicated that a fatal gunshot (C) entered the victim's left side and traveled through his body.  Dr. Start believed that this gunshot wound was consistent with the victim turning to his right away from the shooter. (*Id.,* pp. 39-49).  Dr. Start testified that gunshot wound (D) involved a bullet entering into the victim's upper mid-back—his left shoulder—and exiting the right upper side of his chest. (*Id.,* pp. 49-50).  Dr. Start acknowledged the possibility that the bullet inflicting wound D could have also re-entered the victim's body and have inflicted wound A in the lower right forearm. (*Id.,* pp. 60-61).  Dr. Start indicated that gunshot wound (E)

4

began with an entrance of the bullet at the victim's upper left side of his back shoulder and exited at his lower left chin area. (*Id.,* pp. 52-55). Dr. Start noted that the track of this bullet was consistent with a person falling down at the time he was shot. (*Id.,* pp. 55). Dr. Start stated that gunshot wound (F) involved the bullet entering into the victim's left back/shoulder region and leaving his body around the front of his left upper arm. (*Id.,* pp. 55-56). Dr. Start also described gunshot wound (G), which had an entrance at the lower right side of the victim's chin, before exiting towards the front of his chin. Dr. Start opined that this was further evidence that the victim was shot from behind. (*Id.,* p. 57). Dr. Start stated that the victim's death was caused by the gunshot wounds to his chest and back and that the manner of death was a homicide. (*Id.,* pp. 64-65). Dr. Start stated definitively that gunshot wounds C-G were inflicted when the victim had either his side or his back to the shooter or shooters. (*Id.,* p. 85).

Subsequent to the shooting, police began searching the area for the shooters. Officers ended up at petitioner's mother's house, which was near the crime scene, where they located the co-defendant. (Tr. 3/21/07, pp. 3-16; 50-55). Officers searched the home and located an empty gun case, fresh blood droplets in the kitchen area, and two white t-shirts balled up on the bed. (*Id.,* pp. 15-16, 50-55, 59-64, 162-78; Tr. 3/22/07, 68-73). DNA testing revealed that the blood droplets belonged to petitioner. (Tr. 3/21/07, pp. 165-71). Officers noticed an old fence that had been knocked down behind the house, which looked as though

someone had jumped over the fence, fallen down, and possibly had been injured. The police noticed fresh minor abrasions  on both petitioner and Bailey at the time of their arrests. (Tr. 3/21/07, pp. 9-11, 63-64, 76-77).

Fenis Harmon, petitioner's grandfather, testified that petitioner showed up at his house on the day of the shooting, accompanied by a woman and small child.  Petitioner had also brought along a bag with two guns.  Petitioner asked his grandfather if he would permit him to burn the guns there, but his grandfather refused to let him.  Petitioner then asked his grandfather for some rubbing alcohol to wash his hands and also asked him the location of the nearest dumpster. (*Id.,* pp. 106-115).

Petitioner was stopped by police on I-96 shortly after 8:30 p.m. on the night of the shooting.  Petitioner was accompanied by Latrice Goree and a small child.  The vehicle was full of clothing.  Petitioner was placed into the back of a patrol car, which had both a visual and audio recorder running.  Petitioner was heard on tape saying "There goes my life. My life's over."  At another point, petitioner several times asked Goree to "Tell them I was with you."  Police subsequently searched petitioner's vehicle and recovered bundles of cash totaling $10,000, which had been hidden in socks that were in the pockets of sweatpants. (Tr. 3/21/07, pp. 65-80, 84-89; 100-01).

Tina Sterling testified that in June or July of 2005, petitioner had given her and her niece, Latrice Goree, a ride to Sterling's daughter's house.  After

6

petitioner left, the victim showed up at the house. Goree informed Sterling that it looked like the victim was wearing petitioner's jewelry. Goree then telephoned petitioner to inform him that the victim was there. Petitioner came to the house and ran inside but missed the victim, who had exited out a back door. Sterling testified said that when petitioner came back outside after missing the victim, he told the others, "Wherever I see this mother-fucker at, I'm gonna kill him." (Tr. 3/22/07, pp. 55-62).

Petitioner testified that on the day of the shooting, he saw the victim standing on the corner of Prince and Dallas streets, near his mother's house. Petitioner testified that he approached the victim and requested to pay him for the return of property that petitioner alleged had been taken from him. Petitioner asked his brother, Sammie Bailey, to go with him to "watch [his] back," while petitioner armed himself with a .40 caliber gun before going. When he got to the corner where the victim was, petitioner testified that he approached the victim and asked him if he could pay him to get his ring back and to leave petitioner and his family alone. According to petitioner, the victim responded by threatening to rob him again and reached for a firearm, at which point petitioner "relinquished (sic) mine and fired out a shot, or maybe two" before running away. Petitioner testified that his gun jammed and that the victim was still standing after petitioner fired a shot or two. (Tr. 3/26/07, 19-22, 66). Petitioner guessed that Bailey was behind him when he went to talk to the victim. (*Id.,* p. 38). Petitioner was unsure how

7

many shots his brother discharged, stating "[p]robably just a couple." (*Id.,* p. 41).

Petitioner testified that he had been robbed on two prior occasions by the victim, before adding on cross-examination that he had been robbed a third time by the victim.  Petitioner claimed that he reported that particular robbery to the police.  When asked why he didn't also report the other two robberies to the police, petitioner first indicated that he did not believe the police would believe him, but when asked again, claimed that the victim had threatened his mother so petitioner was frightened for her.  When asked why the jury was hearing about a third robbery for the first time in court that day instead of when his attorney had submitted an offer of proof as to his defense, petitioner replied, "I mean, because we—we were undecided on what, you know—how we were gonna come about bringing that out, ma'am." (*Id.,* pp. 8-9, 14-16, 30-32).

Petitioner claimed that he had previously attempted to request his stolen property back by going to a location where the victim reportedly was at the time, the house of his girlfriend's cousin, but insisted that he never exited his motor vehicle because his ankle was broken. (*Id.* pp. 11-12).  The medical record from a hospital concerning treatment of his ankle, however, indicated that there was "no actual fracture or dislocation." (*Id.,* pp. 32).  When confronted with the document that indicated an apparent sprain rather than a broken ankle, petitioner stated that "it was fractured to me" and claimed, "It's still swollen right now, as we speak," although nearly two years had elapsed between the sprain and the trial.

8

(*Id.,* pp. 32-33).  Petitioner admitted that after the shooting he told Bailey to "get me the guns" and that he "dumped them in a dumpster." (*Id.,* pp. 43, 45).

Petitioner was also asked about his conversation with his mother after his arrest in which he asked her to tell Bailey to say that the shooting was an accident.

Petitioner's response was, "I don't know if I was referring to that." (*Id.,* p. 86).

Jiono McCollough testified about an incident where the victim robbed him and petitioner. (*Id.,* pp. 93-98).  Mary Goree testified that she had known the victim for about five or six years and that he had a reputation for carrying a gun and as a neighborhood drug dealer. (*Id.,* p. 107).  Terrell Ross testified that he had known the victim for about five or six years, that he used to purchase drugs from him, that he had heard that the victim had robbed people before, and that his nickname was "Killer-Keith." (*Id.,* pp. 114-115).

Following deliberations, petitioner was found guilty of first-degree murder and felony-firearm.

Petitioner's conviction was affirmed on appeal. *People v. Lambeth,* No. 278519 (Mich.Ct.App. December 18, 2008); *lv. den.* 484 Mich. 868, 769 N.W.2d 673 (2009). [1]

---

[1]  Petitioner's co-defendant Sammy Ray Bailey Jr. was found guilty of second-degree murder and felony-firearm by his jury.  Bailey's appeal of right was consolidated with petitioner's appeal of right. Bailey's conviction was initially affirmed on appeal. *People v. Bailey,* No. 278411 (Mich.Ct.App. December 18, 2008); *reconsideration den.* May 21, 2009.  The Michigan Supreme Court remanded the matter to the Michigan Court of Appeals to reconsider whether the trial court's erroneous self-defense instructions (which petitioner complains of in Claim # 1) amounted to harmless error. *People v. Bailey,* 485 Mich. 1083, 777 N.W.2d 424 (2010).  On remand, the Michigan Court of Appeals ruled that the erroneous self-defense instructions were not harmless and reversed Bailey's conviction and remanded for a new trial. *People v.*

9

Petitioner seeks a writ of habeas corpus on the following grounds:

I.  Petitioner was denied his due process right to a fair trial by the trial court's erroneous, muddled, confusing, and burden-shifting instructions on self-defense and defense of others. U.S. Const., Amend. §§ V, XIV.

II. Petitioner was denied his constitutional right to present a defense when the trial court suppressed evidence of the deceased's reputation for violence contrary to both the U.S. and Michigan Constitutions. U.S. Const., Amend. §§ V, VI, XIV; Mich. Const. 1963, Art. 1, §§ 17, 20.

## II.  Standard of Review

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death

Penalty Act of 1996 (AEDPA), imposes the following standard of review for

habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if

---

*Bailey,* No. 278411 (Mich.Ct.App. July 20, 2010); *lv. den.* 489 Mich. 876; 795 N.W. 2d 821 (2011).  On July 14, 2011, Bailey pleaded guilty to second-degree murder, with a sentence agreement of thirteen to forty years in prison, which was a reduction from his original sentence of twenty two to fifty years in prison. See www.mlive.com/news/grand-rapids/...killer_sammie_bailey.html.   A federal court can take judicial notice of information contained in a newspaper article. *See e.g. Logan v. Denny's, Inc.,* 259 F. 3d 558, 578, n. 9 (6th Cir. 2001)(collecting cases); *U.S. ex rel. Dingle v. BioPort Corp.,* 270 F. Supp. 2d 968, 973 (W.D. Mich. 2003).

the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409.  A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

The Supreme Court has explained that "[A] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,'and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010)((quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (*per curiam*)).  "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011)(citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  The Supreme Court has emphasized "that even a strong case for relief does not

11

mean the state court's contrary conclusion was unreasonable." *Id.* ( citing

*Lockyer v. Andrade,* 538 U.S. 63, 75 (2003).  Furthermore, pursuant to §

2254(d), "a habeas court must determine what arguments or theories supported

or...could have supported, the state court's decision; and then it must ask

whether it is possible fairminded jurists could disagree that those arguments or

theories are inconsistent with the holding in a prior decision" of the Supreme

Court. *Id.*

    "[I]f this standard is difficult to meet, that is because it was meant to be."

*Harrington,* 131 S. Ct. at 786.  Although 28 U.S.C. § 2254(d), as amended by the

AEDPA, does not completely bar federal courts from relitigating claims that have

previously been rejected in the state courts, it preserves the authority for a

federal court to grant habeas relief only "in cases where there is no possibility

fairminded jurists could disagree that the state court's decision conflicts with" the

Supreme Court's precedents. *Id.*  Indeed, "Section 2254(d) reflects the view that

habeas corpus is a 'guard against extreme malfunctions in the state criminal

justice systems,' not a substitute for ordinary error correction through appeal." *Id.*

(citing *Jackson v. Virginia,* 443 U.S. 307, 332, n. 5 (1979))(Stevens, J.,

concurring in judgment)).  Thus, a "readiness to attribute error [to a state court] is

inconsistent with the presumption that state courts know and follow the law."

*Woodford,* 537 U.S. at 24.  Therefore, in order to obtain habeas relief in federal

court, a state prisoner is required to show that the state court's rejection of his

claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington,* 131 S. Ct. at 786-87.

### III.  Discussion

### A.  Claim # 1.  The instructional error claim.

Petitioner first contends that he was deprived of a fair trial because of the "erroneous, muddled, confusing and burden-shifting instructions on self-defense and defense of others" that was given by the trial court, in *lieu* of the standard Michigan jury instructions on self-defense and defense of others.

Petitioner first points to the judge's instruction that petitioner and his co-defendant "forfeited" the right to use deadly force to defend themselves if they were the first to use deadly force, describing that situation as "the ultimate bootstrapping." (Tr. 3/28/2007, p. 62).  The judge then described this "forfeiture" idea as follows:

> Nor can a person claim self-defense if they provoked the other person into using deadly force.  They deliberately provoke them into using deadly force, and then say, Well, now that they are, I can respond to it.
>
> Nor can a person claim self-defense if what they do is confront someone, intending, by their mere presence, to provoke that person into doing something, and then take advantage of it. That is all making the person who is claiming self-defense the aggressor. You have to be without fault. Without fault means that you can't be the first one to use, and you can't provoke the other person into doing it, and you can't set up a situation where what you mean for them to do is to take the first step so that you are then claiming to take the second step.

13

(*Id.,* pp. 62-63).

Petitioner claims that this instruction misstated Michigan law in that it defined the concept of "aggressor" in an overly broad fashion, by suggesting that petitioner's mere act of confronting the victim on the street made him an aggressor or suggesting that if petitioner's mere presence invoked a violent response from the victim, then the jury should consider petitioner to be the aggressor.

Petitioner further claims that the trial judge's instruction shifted the burden of proof to petitioner by stressing that self-defense applies only "under very limited circumstances" and that this was "a limited defense." (*Id.,* p. 55):

> If there is a realistic possibility, based upon the evidence presented here, that one or both of the defendants acted in either self-defense or defense of another person, then we don't have a murder, if there was a realistic possibility. If, on the other hand, it's not a realistic possibility, no possibility at all, or even just a mere possibility, just a possibility, not a realistic possibility, then murder is back on the table, because then the thing which would eliminate it; justification, doesn't exist.

(*Id.,* p. 56).

The judge again indicated that the circumstances which allow for self-defense "are very narrow" and stressing the "limited circumstances" of the defense, the judge explained to the jurors that "a defendant must have honestly and reasonably believed" that he or she was in immediate danger or being killed or seriously injured. (*Id.,* p. 58). The judge then indicated that "The defendant

14

has to actually believe that he or somebody else is in danger of death or serious injury." (*Id.*).  The judge then stated:

> The circumstances are that you must fear, actually fear and reasonably fear, that then and there you are about to be killed or seriously injured, or that someone else is.  You've got to actually and reasonably believe that the use of deadly force in response is, the only way to fend off that imminent threat.

> (*Id.,* p. 64).

In rejecting petitioner's claim in his consolidated claim with his co-defendant, the Michigan Court of Appeals agreed that these instructions were erroneous under Michigan law, but concluded that any error in giving these instructions was harmless. *Lambeth,* Slip. Op. at * 6-9, 18.

The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack upon the constitutional validity of a state court conviction is even greater than the showing required in a direct appeal.  The question in such a collateral proceeding is whether the ailing instruction so infected the entire trial that the resulting conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even "universally condemned", and an omission or incomplete instruction is less likely to be prejudicial than a misstatement of the law. *Henderson v. Kibbee*, 431 U.S. 145, 154-155 (1977).  The challenged instruction must not judged in isolation but must be considered in the context of the entire jury charge. *Jones v. United States*, 527 U.S. 373, 391 (1999).  Further, any ambiguity, inconsistency or

15

deficiency in a jury instruction does not by itself necessarily constitute a due process violation. *Waddington v. Sarausad*, 129 S.Ct. 823, 831 (2009).  It is not enough that there might be some "slight possibility" that the jury misapplied the instruction. *Id.*  "The issue is not whether the jury instruction could have been applied unconstitutionally, but whether there is a reasonable likelihood that the jury applied the instruction in an unconstitutional manner." *Haskell v. Berghuis,* 695 F. Supp. 2d 574, 592 (E.D. Mich. 2010)(citing *Victor v. Nebraska*, 511 U.S. 1, 6 (1994)).  Federal habeas courts do not grant relief, as might a state appellate court, simply because a jury instruction may have been deficient in comparison to a model state instruction. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).

The Michigan Court of Appeals acknowledged that the self-defense instructions were erroneous, but found that any error was harmless.  "Unless its jurisdiction is at stake, a federal district court on federal habeas review 'may take up issues in whatever sequence seems best, given the nature of the parties' arguments and the interest in avoiding unnecessary constitutional decisions.'" *Dittrich v. Woods*, 602 F. Supp. 2d 802, 809 (E.D. Mich. 2009); *aff'd in part and rev'd in part on other grds,* 419 Fed.Appx. 573 (6th Cir. 2011)(quoting *Aleman v. Sternes,* 320 F. 3d 687, 691 (7th Cir. 2003)).  When a federal court is confronted with several possible grounds for adjudicating a case, any of which would lead to the same disposition of the case, "a federal court should choose the narrowest

16

ground in order to avoid unnecessary adjudication of constitutional issues." *Id.*
(citing *U.S. v. Allen*, 406 F. 3d 940, 946 (8th Cir. 2005)).  Therefore, a federal
district court on habeas review of a state court conviction can proceed directly to
a harmless error analysis of a habeas petitioner's claims without first reviewing
the merits of the claim or claims, "when it is in the interest of judicial economy
and brevity to do so." *Id.* (citing *Porter v. Horn*, 276 F.Supp.2d 278, 344 (E.D.
Pa. 2003).  Because the respondent does not contend that the instructions as
given here were accurate and the Michigan Court of Appeals acknowledged that
the self-defense instructions were erroneous, this Court will proceed to a
harmless error analysis of the instructions.

    The U.S. Supreme Court has long held that jury instruction claims are
subject to a harmless error analysis. *Hedgpeth v. Pulido,* 555 U.S. 57, 61-62
(2008)(instructing a jury on multiple theories of guilt, one of which is invalid, is
subject to harmless error review); *Neder v. U.S.*, 527 U.S. 1, 9-11
(1999)(erroneous jury instruction that omits element of offense is subject to
harmless-error analysis); *Johnson v. U.S.*, 520 U.S. 461, 469 (1997)("improperly
instructing the jury on an element of the offense...is subject to harmless-error
analysis"); *California v. Roy*, 519 U.S. 2, 5 (1996)(error in jury instruction that
defined crime without including statement that jury was required to find that
defendant had intent to commit or facilitate crime had to be reviewed by habeas
court under harmless error standard); *Yates v. Evatt*, 500 U.S. 391, 402-03

17

(1991)(instruction creating mandatory rebuttable presumption subject to harmless error test); *Carella v. California*, 491 U.S. 263, 266 (1989)(per curiam) (instruction creating mandatory conclusive presumption subject to harmless error); *Pope v. Illinois*, 481 U.S. 497, 501 (1987)(misstatement of element can be harmless error); *Rose v. Clark,* 478 U.S. 570, 579-80 (1986)(burden shifting instruction subject to harmless error review).

On direct review of a conviction, a constitutional error is considered harmless only if the reviewing court finds it was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24 (1967)). However, in *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), the U.S. Supreme Court held that for purposes of determining whether federal habeas relief must be granted to a state prisoner on the ground of federal constitutional error, the appropriate harmless error standard to apply is whether the error had a substantial and injurious effect or influence in determining the jury's verdict.  "Citing concerns about finality, comity, and federalism," the Supreme Court in *Brecht* "rejected the *Chapman* standard in favor of the more forgiving standard of review applied to nonconstitutional errors on direct appeal from federal convictions." *Fry v. Pliler*, 551 U.S. 112, 116 (2007)(citing *Kotteakos v. United States*, 328 U.S. 750 (1946)).  The Supreme Court in *Brecht* indicated that application of the *Chapman* harmless error test by a federal court reviewing a state court conviction on habeas review would undermine a state's "interest in finality," would infringe

18

upon a state's sovereignty over its own criminal matters, "would undercut the historic limitation of habeas relief to those who had been '"grievously wronged,"' and would impose '"significant 'social costs.'"' *Fry,* 551 U.S. at 117 (quoting *Brecht,* 507 U.S. at 637).  Thus, *Brecht's* more "forgiving" substantial and injurious effect test for harmless error review applies on habeas review of a state court conviction regardless of whether the state courts engaged in a harmless error analysis of the petitioner's claims. *Fry,* 551 U.S. at 121-22.

The Supreme Court has clearly held that in determining whether to grant habeas relief to a habeas petitioner based upon an erroneous jury instruction, the reviewing court must determine whether that instruction had a substantial and injurious effect or influence on the jury's verdict. *See Hedgpeth v. Pulido,* 555 U.S. at 61-62; *California v. Ray,* 519 U.S. at 5.

Under Michigan law, one acts lawfully in self-defense if he or she honestly and reasonably believes that he or she is in danger of serious bodily harm or death, as judged by the circumstances as they appeared to the defendant at the time of the act. *Blanton v. Elo*, 186 F. 3d 712, 713, fn. 1 (6th Cir. 1999)(citing to *People v. Heflin*, 434 Mich. 482; 456 N. W. 2d 10 (1990)).  To be lawful self-defense, the evidence must show that: (1) the defendant honestly and reasonably believed that he was in danger; (2) the danger feared was death or serious bodily harm or imminent forcible sexual penetration; (3) the action taken appeared at the time to be immediately necessary; and (4) the defendant was

19

not the initial aggressor. *See Johnigan v. Elo,* 207 F. Supp. 2d 599, 608-09 (E.D. Mich. 2002)(citing *People v. Barker*, 437 Mich. 161, 165; 468 N.W. 2d 492 (1991); *People v. Kemp*, 202 Mich. App. 318, 322; 508 N.W.2d 184 (1993); *People v. Deason*, 148 Mich. App. 27, 31; 384 N.W.2d 72 (1985)).  Under Michigan law, a defendant is not entitled to use any more force than is necessary to defend himself. *Johnigan,* 207 F. Supp. 2d at 609 (citing *Kemp*, 202 Mich. App. at 322).  "[T]he law of self-defense is based on necessity, and a killing or use of potentially lethal force will be condoned only when the killing or use of potentially lethal force was the only escape from death, serious bodily harm, or imminent forcible sexual penetration under the circumstances." *Johnigan,* 207 F. Supp. 2d at 609 (internal citation omitted).  In Michigan, the right to act in self-defense also includes the right to defend another person. *Id.* (citing *People v. Curtis*, 52 Mich. 616, 622; 18 N.W. 385 (1884); *People v. Wright*, 25 Mich.App. 499, 503; 181 N.W.2d 649 (1970)).

This Court concludes that petitioner is not entitled to habeas relief because the erroneous self-defense instructions did not have a substantial and injurious effect or influence on the verdict, in light of the lack of evidence to support petitioner's self-defense claim as well as the excessive force that was employed by petitioner and the co-defendant.  Witnesses indicated that petitioner and the co-defendant shot the victim several times as he was turning and running away from them.  Several witnesses testified that either petitioner or

the co-defendant fired additional shots at the victim after he was already lying on the ground.  The medical examiner indicated that the victim suffered seven gunshot wounds and that at least five of these wounds were inflicted while the victim had his side or his back turned towards his assailants.  The fact that the victim was shot multiple times in the back or the side undercuts any credible self-defense claim, so as to render the defective self-defense instructions harmless.  *See Cain v. Redman*, 947 F. 2d 817, 822 (6th Cir. 1991).  Additionally, although petitioner claims that the victim threatened him with a gun, the witnesses to the crime all testified that the victim did not have a firearm in his possession at the time of the shooting and no weapons were recovered by the police from the crime scene.  The lack of any evidence to support petitioner's claim that the victim was armed with a gun seriously undercuts petitioner's self-defense claim.  Evidence that the victim was unarmed at the time of the shooting disproves petitioner's self-defense claim. *See Johnigan,* 207 F. Supp. 2d at 609.  Finally, Tina Sterling testified that about a year prior to the shooting, petitioner informed her that whenever he saw the victim, he stated: "I'm gonna kill him."  Petitioner's prior threat to kill the victim undercuts any self-defense claim. See e.g. *People v. Freeman*, 32 Mich.App. 321, 323; 188 N.W.2d 200 (1971).

Moreover, petitioner's conduct after the shooting seriously calls into question his self-defense claim.  First, there was evidence that petitioner and his brother changed the shirts that they had been wearing during the shooting.

21

Petitioner also disposed of the firearms after the murder.  These activities would support a finding of premeditation and deliberation and negate any self-defense argument. *See e.g. Marsack v. Howes*, 300 F. Supp. 2d 483, 492 (E.D. Mich. 2004).  There was also evidence that petitioner attempted to flee Grand Rapids, as the police arrested him leaving town with a large amount of clothes and $10,000.00 hidden in his socks.  Under Michigan law, flight is relevant to consciousness of guilt. *Johnson v. Burke*, 903 F. 2d 1056, 1062 (6th Cir. 1990)(internal citations omitted).  Petitioner's flight from Grand Rapids with a large sum of money and a large number of clothes could certainly undercut his self-defense argument. *See e.g. Dorchy v. Jones,* 320 F. Supp. 2d 564, 580 (E.D.Mich. 2004).  Lastly, after petitioner was arrested, police overheard him asking his girlfriend several times to tell the police that petitioner had been with her on the day of the shooting.  Petitioner's attempt to manufacture an alibi was clearly inconsistent with his self-defense claim, as an attempt to manufacture a false alibi defense can be considered as evidence of guilt as to the crime charged under both Michigan and federal law. *See People v. Ranes,* 58 Mich. App. 268, 271-72; 227 N.W. 2d 312 (1975); *See also Newman v. Metrish,* 492 F. Supp. 2d 721, 731 (E.D. Mich. 2007)(internal citation omitted).

In support of his argument that the erroneous self-defense instructions were not harmless, petitioner points to the fact that the Michigan Court of Appeals found that these instructions were not harmless in his brother's case

and reversed his second-degree murder conviction.

The mere fact that the Michigan Court of Appeals reversed the co-defendant's conviction would not entitle petitioner to habeas relief. First, there was a great deal more evidence against petitioner than his brother. Although the Michigan Supreme Court remanded the co-defendant's case back to the Michigan Court of Appeals for further review on the issue of the harmlessness of the self-defense instructions as given, the Michigan Supreme Court unanimously denied petitioner's application for leave to appeal. Secondly, the Michigan Court of Appeals reviewed the co-defendant's conviction on direct review and was able to employ the more lenient *Chapman* harmless error standard. By contrast, this Court on habeas review must employ the "more forgiving standard of review" enunciated in *Brecht* and *Fry* and can only grant habeas relief if the Court finds that the erroneous jury instructions had a substantial and injurious effect or influence on the jury's verdict, which this Court is unable to do, in light of the substantial evidence of guilt in this case. Finally, although not dispositive, this Court notes that following reversal of his conviction, the co-defendant chose to plead guilty to the same second-degree murder charge, albeit with a lesser sentence, rather than assert a self-defense claim at a second trial.

In the present case, the evidence presented at petitioner's trial left no doubt that he was guilty of first-degree murder. The evidence established that petitioner had previously threatened to kill the victim, that he and his brother shot

23

the victim seven times in the back and the side, that none of the witnesses saw the victim with a gun, that petitioner discarded the weapons and attempted to change his appearance and flee the city, and that petitioner attempted to fabricate an alibi when arrested. Because there was no evidence to support a credible self-defense theory in this case, any error in the self-defense instructions did not have a substantial and injurious effect or influence on the jury's decision. Petitioner is not entitled to habeas relief on his first claim.

**B. Claim # 2. The right to present a defense claim.**

Petitioner next alleges that the trial court violated his right to present a defense by precluding him from eliciting testimony from Detective Patrick Needham that would have established the victim's reputation for violence and his history of firearm-related arrests.

Before trial, defense counsel requested to cross-examine Needham regarding his knowledge whether the victim had possessed weapons before May 2006. Needham had testified to this effect at the preliminary examination. Counsel for Lambeth also wanted to cross-examine Needham concerning statements that he made to the Grand Rapids Press, "indicating that the deceased had caused trouble and an understanding or acknowledgment that-how difficult it is to live in the community where my client [Lambeth] lives and how those pressures can build up."

In denying petitioner's request, the trial court cited to concerns involving

24

hearsay, relevance and the materiality of this testimony.  The trial judge also ruled that the "neighborhood's reputation isn't the issue here." (Tr. 3/22/2007, pp. 103-07).

The Michigan Court of Appeals affirmed the decision, holding that the sought after evidence involved specific instances of conduct, rather than the victim's character and reputation for violence, and were hence inadmissible pursuant to M.R.E. 405(a). *Lambeth,* Slip. Op. at * 3-4, 18.

Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he also has the right to present his own witnesses to establish a defense.  This right is a fundamental element of the due process of law. *Washington v. Texas*, 388 U.S. 14, 19 (1967); *See also Crane v. Kentucky,* 476 U.S. 683, 690 (1986)("whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense'")(internal citations omitted).  However, an accused in a criminal case does not have an unfettered right to offer evidence that is incompetent, privileged, or otherwise inadmissible under the standard rules of evidence. *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996).  The Supreme Court, in fact, has indicated its "traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts." *Crane,* 476 U.S. at 689.  The

25

Supreme Court gives trial court judges "wide latitude" to exclude evidence that is repetitive, marginally relevant, or that poses a risk of harassment, prejudice, or confusion of the issues. *Id.* (*quoting Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986)). Finally, rules that exclude evidence from criminal trials do not violate the right to present a defense unless they are "'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *United States v. Scheffer*, 523 U.S. 303, 308 (1998)(*quoting Rock v. Arkansas*, 483 U.S. 44, 56 (1987)).

Moreover, under the standard of review for habeas cases as enunciated in § 2254(d)(1), it is not enough for a habeas petitioner to show that the state trial court's decision to exclude potentially helpful evidence to the defense was erroneous or incorrect. Instead, a habeas petitioner must show that the state trial court's decision to exclude the evidence was "an objectively unreasonable application of clearly established Supreme Court precedent." *See Rockwell v. Yukins,* 341 F. 3d 507, 511-12 (6th Cir. 2003).

Under Michigan law, evidence that a defendant knew of a victim's violent acts or reputation is relevant to show a state of mind consistent with self-defense, and proof of a victim's violent character, regardless of the defendant's knowledge of it, would be relevant to show that victim acted in conformity. *See Allen v. Howes*, 599 F. Supp. 2d 857, 872 (E.D. Mich. 2009)(citing *People v. Harris*, 458 Mich. 310, 314-20, 583 N.W.2d 680 (1998)).

Petitioner is not entitled to habeas relief on his claim, because there was

26

other evidence presented at trial to support his claim that the victim had

threatened him in the past, so as to support his self-defense claim. *Allen,* 599 F.

Supp. 2d at 872-73.  Petitioner testified that the victim had robbed him three

times in the past.  Jiono McCollough testified about a prior incident, in which the

victim robbed him and petitioner.  Mary Goree testified that the victim had a

reputation for carrying a gun and as a neighborhood drug dealer.  Terrell Ross

testified that he had heard that the victim had robbed people before and stated

that his nickname was "Killer-Keith."  Because the evidence that was admitted

gave petitioner a sufficient foundation to establish that he shot the victim in self-

defense or in defense of others, the exclusion of the additional, cumulative

evidence to bolster his self-defense or defense of others claim did not deprive

petitioner of a fair trial. *See Davis v. Burt,* 100 Fed. Appx. 340, 350 (6th Cir.

2004).  With this quantum of evidence, this Court concludes that petitioner was

afforded a "meaningful opportunity" to present his self-defense and defense of

others theory to the jury.  Accordingly, he is not entitled to habeas relief on his

claim. *Allen,* 599 F. Supp. 2d 873.

Further, after reviewing the full record, this Court concludes that the

exclusion of the evidence did not have a substantial and injurious effect or

influence in determining the jury's verdict. *Allen,* 599 F. Supp. 2d at 874.  As

mentioned when addressing petitioner's first claim, the prosecutor presented

significant evidence to rebut petitioner's self-defense and defense of others

27

claim.  In light of the excessive force used by petitioner in this case, the

exclusion of evidence that the victim had a reputation and propensity for violence

or committing robberies did not have a substantial and injurious effect or

influence on the jury's verdict. *See Cortez v. Garcia,* 130 Fed. Appx. 131, 133-34

(9th Cir. 2005).  Petitioner is not entitled to habeas relief on his second claim.

### IV.  Conclusion

The Court will deny the petition for writ of habeas corpus.  The Court will

also deny a certificate of appealability to petitioner.  In order to obtain a

certificate of appealability, a prisoner must make a substantial showing of the

denial of a constitutional right. 28 U.S.C. § 2253(c)(2).  To demonstrate this

denial, the applicant is required to show that reasonable jurists could debate

whether, or agree that, the petition should have been resolved in a different

manner, or that the issues presented were adequate to deserve encouragement

to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000).  When a

district court rejects a habeas petitioner's constitutional claims on the merits, the

petitioner must demonstrate that reasonable jurists would find the district court's

assessment of the constitutional claims to be debatable or wrong. *Id.* at 484.

"The district court must issue or deny a certificate of appealability when it enters

a final order adverse to the applicant."  Rules Governing § 2254 Cases, Rule

11(a), 28 U.S.C. foll. § 2254.

For the reasons stated in this opinion, the Court will deny petitioner a

certificate of appealability because he has failed to make a substantial showing of the denial of a federal constitutional right. *Myers v. Straub,* 159 F. Supp. 2d 621, 629 (E.D. Mich. 2001).

## V. <u>ORDER</u>

Based upon the foregoing, IT IS ORDERED that the Petition for a Writ of Habeas Corpus is **DISMISSED WITH PREJUDICE.**

IT IS FURTHER ORDERED that a Certificate of Appealability is **DENIED.**

**Dated:  September 12, 2011**

<u>**S/George Caram Steeh**</u>

**GEORGE CARAM STEEH**
**UNITED STATES DISTRICT JUDGE**

---

**CERTIFICATE OF SERVICE**

**Copies of this Order were served upon attorneys of record on**
**September 12, 2011, by electronic and/or ordinary mail.**

<u>**S/Josephine Chaffee**</u>
**Deputy Clerk**

---